IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANGELA OLIVER., on behalf of D.O., a minor, <br><br> Plaintiff, <br><br> v. <br><br> KIOLO KIJAKAZI, <br> Acting Commissioner of Social Security, <br><br> Defendant. | Case No. 20 C 4982 <br><br> Magistrate Judge Sunil R. Harjani |

## MEMORANDUM OPINION AND ORDER

Plaintiff Angela O., on behalf of her son, D.O., seeks reversal or alternatively, a remand of the final decision of the Commissioner of Social Security denying D.O.'s application for Supplemental Security Income ("SSI"). The Commissioner moves for summary judgment [29] seeking affirmance of the decision denying benefits. For the reasons that follow, the ALJ's denial of D.O.'s application for SSI is reversed and remanded for further administrative proceedings.

## BACKGROUND

On May 2, 2017, Angela O. filed an application for SSI on behalf of D.O., alleging that D.O. had been disabled since March 2, 2017, when he was seven years old, due to separation anxiety, mood dysregulation disorder, and severe asthma. (R. 49). Of particular concern to Angela O. was the fact that D.O. needed additional measures to assist in completion of daily school and homework assignments. *Id*. D.O. is a school-age child who lives with his mother, his two brothers, and his nephew. *Id*. at 462. D.O. was born a twin, but his twin sister died in her sleep when he was three months old. *Id*. at 370, 580. As a result of that loss, D.O. was diagnosed with Twin Separation Anxiety and was given a service animal when he was a toddler. *Id*. at 368, 370, 580.

Angela O. indicates that D.O. began experiencing behavioral issues in 2016. *Id.* at 656. At that time, she received constant calls from school regarding D.O.'s inattention and aggressive behavior. *Id.* at 656.

During a clinic visit in 2016, Angela O. relayed to D.O.'s primary care physician that D.O. had awful behavioral problems at school and at home. *Id.* at 610. She also noted that D.O. was aggressive and that she could not take him anywhere. *Id.* In late 2016, D.O. participated in a partial hospitalization program at Hartgrove Hospital for aggressive and disruptive behavior and active auditory and vivid hallucinations. *Id.* at 551, 579. According to Angela O., prior to his treatment at Hartgrove Hospital, D.O. had difficulty paying attention in class and following directions, he threatened to kill himself, he laughed when he was disciplined, and he hit himself on the head. *Id.* at 561. Following the partial hospitalization, D.O. was prescribed his first psychotropic medication. *Id.* at 374. On March 2, 2017, D.O. was treated at Hartgrove Hospital for a second time. Prior to the hospitalization and during school on March 2, 2017, D.O. told his teacher he wanted to die, he asked for headphones to choke himself, he hit his head against a window, and he was violent with his peers. *Id.* at 437. As a result, the staff at D.O.'s elementary school made a crisis intervention call to Ada S. McKinley Community Services and an initial intake of D.O. was conducted. *Id.* at 439. Later that day, D.O. was admitted to the inpatient unit at Hartgrove for homicidal thoughts towards his brother, suicidal plans to choke himself with a cord, self-harming, head-banging, and for auditory hallucinations to kill himself. *Id.* at 337. During his treatment at Hartgrove, he was cooperative, but hyperactive, easily distracted, and would often require redirection. *Id.* at 329, 358.

Additionally, D.O. reported that while his grades in school were decent, he got in trouble for his behavior, and that he slapped himself and hit himself in the head when he was angry. *Id.* at

2

358. D.O. also reported hearing voices is in his head telling him to kill himself and seeing a girl in the television. *Id.* Prior to being admitted at Hartgrove Hospital, D.O. had not taken his medications for two weeks. *Id.* at 440, 447. During his hospitalization, D.O. was prescribed Adderall and Zyprexa to treat his disruptive mood dysregulation disorder and attention deficit hyperactivity disorder. *Id.* at 323-24, 432. At a mental health assessment on March 21, 2017, Angela O. reported that D.O. was not listening or following direction at school, that he did not want to complete homework, and that he was still seeing a little girl at night and a man on his light bulb. (R. 447). She also stated that D.O. was hyper, impulsive, unable to sit still, had a short attention span, and was easily angered, agitated, and frustrated. *Id.* D.O. reported difficulty paying attention, being easily distracted, and confirmed that he banged his head on the wall when he was upset. *Id.* The mental health specialist identified that D.O. was easily distracted, had average intelligence, poor judgment related to his self-injurious behavior, and was limited by his anger although he presented himself to be friendly and caring. *Id.* at 451-55. During a psychiatric evaluation at Ada S. McKinley Community Services on April 3, 2017, the assessing psychiatrist determined that D.O. was anxious, impulsive, aggressive, and gave him a 45 rating under the global assessment of functioning scale, which indicates that D.O. had serious impairments in social occupational or school functioning and serious symptoms that could be related to suicidal ideation.[1] *Id.* at 433. D.O.'s recommended treatment plan included individual and family therapy, case management mental health, community support, and medication. *Id.* at 472.

Furthermore, D.O. visited Ada S. McKinley Community Services numerous other times for treatment. *See id.* at 435, 467, 501, 504, 506, 508, 542, 548. D.O. also had numerous primary

---

[1]MacArthur Study, *DSM-III-R AXIS V Global Assessment of Functioning Scale* (6/1/1992), http://cda.psych.uiuc.edu/statistical_learning_course/Allcode_manuals/gaf.pdf

care visits where his behavioral issues and self-injurious tendencies were noted. *See. id.* at. 412, 419, 495, 603, 608. Next, at a behavioral health assessment on March 23, 2018, D.O. related that he was seeking treatment due to aggression, self-harm, defiance, and poor hygiene. *Id.* at 511. At that appointment, Angela O. declared that D.O. was verbally and physically aggressive, that he banged his head on the wall, that he refused to do his schoolwork, and that he had poor hygiene. *Id.* The qualified mental health professional who evaluated D.O. determined that his problems were severe, that he demonstrated appropriate insight but lacked age-appropriate judgment, and that he was cooperative during the assessment. *Id.* at 511, 528.

In addition, on April 19, 2018, D.O. was examined by a licensed psychologist, Dr. Karr, and during the session D.O. related that he had a history of banging his head when he was frustrated, that he was suspended for fighting, and that he took medication for his anger. *Id.* at 484. Dr. Karr noted that D.O. appeared subdued, dysphoric, alert, and coherent during the exam. *Id.* at 486. Dr. Karr confirmed his diagnosis of mood dysregulation disorder, ADHD, and separation anxiety. *Id.* at 485. Similarly, on April 24, 2018, D.O. had a second exam at Highland Community Medical Center by Bala Kanagaraju where the examiner listed the same diagnosis as Dr. Karr and noted that D.O. bangs his head on the wall during temper tantrums. *Id.* at 489, 491. The examiner also noted that D.O. was active, cooperative, but unable to sit still during the examination. *Id.* at 490. On October 16, 2018, D.O. again underwent a crisis assessment at school by Ada S. McKinley Community Services, this time, because he was stabbing himself in the stomach with a pencil and was being physically aggressive. *Id.* at 544. After the assessment, he was diagnosed with depressive disorder and given a score of 40 in the children's global assessment scale, indicating a major impairment in several areas and unable to function in one area, such as at home, at school, with peers, or in society at large. The assessment further stated: "persistent aggression

4

without clear instigation; markedly withdrawn and isolated behavior due to either mood or thought disturbance, and suicidal attempts with clear lethal intent."[2] *Id.*

Moreover, at school, D.O. was given a 504 special education plan due to his inability to attend to his work, complete tasks, and focus on learning at. *Id.* at 177. As part of the 504 plan, a social worker met directly with D.O. weekly when he was in second and third grade. *Id.* at 178, 275. He also received academic support in all subject areas and was given accommodations during the non-academic portion of the school day. *Id.* at 273. Nevertheless, D.O. amassed nearly 50 documented disciplinary infractions between March of 2017 and March of 2019. *See* (R. 284-301). On more than one occasion, he threatened to stab and kill his teacher, walked out of the classroom, was off task and out of control, had altercations with other students, interrupted the class, lunged at a teacher, kicked, and broke a window, growled at his teacher, hit his head on the wall, cut his wrists with a pencil, and banged his head on a white board. *See id.* at 284, 285, 286, 287, 289, 291, 294, 296, 300.

As part of D.O.'s claim for disability, in April of 2019 his teacher, Ms. Roth, completed a teacher questionnaire. *Id.* at 308, 311. The questionnaire asks teachers to assess the claimant's abilities across each of the six domains used to determine childhood disability. In addition to having space for the teachers to write narrative information, the forms contained check boxes that broke down the essential functions of each domain and asked the teacher to rate the child on a scale of one-to-five for each function, with one indicating "no problem," two indicating "a slight problem," three indicating "an obvious problem," four indicating "a serious problem," and five indicating "a very serious problem" performing the particular task. Regarding the domain of

---

[2] *See* MacArthur Study *supra* note 1; NSW Department of Health *Children's Global Assessment Scale* (05/31/2002), https://www.thereachinstitute.org/wp-content/uploads/2021/06/CGAS.pdf

5

attending and completing tasks, Ms. Roth noted that D.O. had no issues in nine out of the 13 listed activities, that he had a slight problem waiting to take turns and completing class and homework assignments on a weekly basis, and that he had serious problem organizing his own things and working without distracting others daily. *Id.* at 308. Regarding caring for himself, she noted that he had a very serious problem in seven out of nine activities. *Id.* at 311. The nine activities included: handling frustration properly, being patient when necessary, being responsible for taking medication, identifying, and asserting appropriate emotional needs, responding appropriately to changes in mood, using appropriate coping skills to meet the daily demand of school environment, and knowing when to ask for help. *Id.* In six out of the nine activities his teacher noted that he had issues on an hourly basis. *Id.* She also indicated that he had a serious problem using good judgment regarding personal safety on a daily basis, a slight problem caring for physical needs on a daily basis, and a slight problem taking care of personal hygiene. *Id.* Moreover, under the domains of interacting and relating to others and caring for himself, Ms. Roth noted that D.O. did not have any issues when he took his medication. *Id.* at 309, 311. She also noted that every two weeks or once every ten days he did not take his medication, and that during those occasions it was impossible for him to access the curriculum. *Id.* at 312. In July 2017, his case manager completed a similar questionnaire and she noted that D.O. had obvious daily problems working without distracting self or others, changing from one activity to the next, and focusing long enough to finish a task in the attending and completing tasks domain. *Id.* at 208. She also noted that he had slight problems in nine other activities in that domain. *Id.* Further, she did not observe any problem in the caring for himself domain. *Id.* at 211.

Finally, the Disability Determination Services reviewing physicians determined that D.O. had a less than marked limitation in attending and completing tasks and no limitation in caring for

6

self. *Id.* at 53, 64, 65. The reviewing physicians did, however, find that D.O. had a marked limitation in the interacting and relating with others domain because of his aggressive behavior, removals from class, need for extra assistance, and inability to deal with emotions. *Id.* at 65.

D.O.'s application was initially denied on August 11, 2017 and upon reconsideration on May 18, 2018. *Id.* at 57, 70, 95, 107. On June 6, 2018, Angela O. requested a hearing before an ALJ, and on March 13, 2019 the hearing was held. *Id.* at 111-13, 11. Angela O., D.O., and D.O.'s grandmother testified at the hearing before ALJ Bill G. Laskaris. *Id*. at 11-48. At the hearing, D.O. testified that he did not always take his medication, that he got in trouble at school, and that he was suspended for breaking a glass door at school the prior year. *Id.* 17-18. Angela O. testified that D.O. bangs his head on brick walls, and that he was removed from class for self-injurious behavior. *Id.* at 36. D.O.'s grandmother testified that his behavioral issues did not go away with medication, but that they did subside. *Id.* at 42. She also said that she monitors D.O. when he is in the shower to make sure that he is washing up. *Id.* at 46.

On July 3, 2019, the ALJ issued a decision denying D.O.'s application for SSI. *Id*. at 71-94. Applying the three-step sequential evaluation process for evaluating whether a child is disabled, the ALJ found at step one that D.O. had not engaged in substantial gainful activity since the date of his application. *Id*. at 77. At step two, the ALJ found that D.O. has the following severe impairments: disruptive mood dysregulation disorder, attention deficit hyperactivity disorder, and separation anxiety. *Id*. At step three, the ALJ determined that D.O. does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listed impairments. *Id*. at 77-78. The ALJ next determined that D.O. does not have an impairment or combination of impairments that functionally equals the severity of any listing. *Id*. at 78-88. In making the functional equivalence determination, the ALJ found that D.O. has a marked limitation

in interacting and relating to others; a less than a marked limitation in acquiring and using information, attending and completing tasks, health and physical well-being; and no limitations in moving about and manipulating objects and caring for himself. *Id*. at 83-88. Based on these findings, the ALJ concluded that D.O. has not been disabled since the date of his application. *Id*. at 88-89. The Appeals Council denied D.O.'s request for review on May 20, 2020. *Id*. at 1-7. D.O. now seeks judicial review of the ALJ's decision, which is the final decision of the Commissioner. *Jozefyk v. Berryhill*, 923 F.3d 492, 396 (7th Cir. 2019).

## DISCUSSION

Under the Social Security Act, a child qualifies as disabled and therefore may be eligible for SSI if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" and the impairment "has lasted or can be expected to last for a continuous period of not less than 12 months." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). When determining whether a child meets this definition, the ALJ applies a three-step sequential evaluation process: (1) has the child engaged in substantial gainful activity; (2) does the child have a medically determinable impairment (or combination of impairments) that is severe and (3) does the severe impairment (or combination of impairments) meet, medically equal, or functionally equal the severity of a listing. *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1150 (7th Cir. 2019). To determine whether a child's impairment functionally equals a listing, "the ALJ considers six domains of functioning: (1) acquiring and using information; (2) attending to and completing tasks; (3) interacting with and relating to other people; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being." *Id*. at 1150-51. "Functional equivalence exists, and a child qualifies for benefits, if the ALJ finds a marked difficulty in two domains of functioning or an extreme limitation in one." *Murphy v. Astrue*, 496

F.3d 630, 633 (7th Cir. 2007). A "marked" limitation is one which interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). An "extreme" limitation occurs when the impairment very seriously interferes with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i).

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). As the Supreme Court recently stated, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is 'more than a mere scintilla.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In reviewing an ALJ's decision, the Court may "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the" ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted). "Ultimately, the ALJ must sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence and to enable us to trace the path of his reasoning." *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir.1993); *Robinson ex rel. M.R. v. Astrue*, No. 10 CV 4056, 2012 WL 3991625, at *7 (N.D. Ill. Aug. 29,

9

2012). Moreover, when the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

Angela O. challenges two of the ALJ's findings. Angela O. first contends that the ALJ erred in finding that D.O. did not have a marked limitation in the domain of caring for yourself. Second, Angela O. argues that the ALJ erred in finding that D.O. did not have a marked limitation in the domain of attending and completing tasks. Angela O. does not object to the ALJ's following findings: that D.O. has a marked limitation in interacting and relating to others; that he has a less than a marked limitation in acquiring and using information and health and physical well-being; and that he has no limitations in moving about and manipulating objects. As further stated below, the Court concludes that substantial evidence is lacking to support the ALJ's finding that D.O. does not have marked limitations in the caring for yourself domain. Indeed, this is a case where the ALJ's opinion lacks the minimal analysis required and is so poorly articulated that it prevents meaningful review. As a result, remand is warranted.

In the caring for yourself domain, an ALJ should consider how well a healthy emotional and physical state are maintained, including physical and emotional wants and needs, stress and changes in the environment; and caring for physical health, possessions, and living areas. 20 C.F.R. § 416.926a(k). "Caring for yourself means recognizing when you are ill, following recommended treatment, taking medication as prescribed, following safety rules, responding to your circumstances in safe and appropriate ways, making decisions that do not endanger yourself, and knowing when to ask for help from others." *Id.* School-age children (age 6 to 12) should be independent in most day-to-day activities, should begin to recognize in what activities they are competent and in which they have difficulty, should be able identify those circumstances when they feel good about themselves and when they feel bad, begin to develop understanding of what

10

is right and wrong, and understand what acceptable and unacceptable behavior is. *Id.* School age children should also begin to demonstrate consistent control over their behavior and should be able to avoid behaviors that are unsafe or otherwise not good. *Id.* Some examples of limitations in caring for yourself that are provided in the regulations are: (i) placing non-nutritive or inedible objects in your mouth; (ii) using self-soothing activities showing developmental regression or having restrictive or stereotyped mannerisms (e.g., body rocking, headbanging); (iii) not dressing or bathing self appropriately; (iv) engaging in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or ignoring safety rules; (v) not spontaneously pursuing enjoyable activities or interests; or (iv) having disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3)(i)-(vi).

The ALJ's finding of no limitation in the caring for yourself domain lacks explanation and supporting evidence. First, in his analysis of this domain, the entirety of the ALJ's reasoning is as follows:

> "The Disability Determination Services reviewing physicians on initial review and reconsideration determined that the claimant had no limitation in this domain and their assessment is consistent with the evidence as a whole. (Exhibit 1A; 3A). In April 2019, the claimant's teacher reported that the claimant had no problem in this domain when he took his medication. (Exhibit 16E)." (R. 88).

The ALJ's perfunctory analysis does not assure the Court that the ALJ considered the important evidence pertaining to this domain, and his statements fail to create a traceable path for his reasoning. While the ALJ referenced a sentence from Ms. Roth's questionnaire, the ALJ failed to explain why he gave no weight to the other portions of the questionnaire which might support a finding that D.O. has a marked limitation in caring for himself. *See Murphy,* 496 F.3d at 634–35 (reversing the ALJ's decision where he "did not explain why he gave no weight to the portions of the school documents which support a finding of disabled" and "did little to counter this

11

evidence"); *Hopgood*, 578 F.3d at 700 (remanding, in part, because ALJ did not properly explain assessment of teacher's evaluation). In Ms. Roth's evaluation of D.O.'s activities in the caring for yourself domain, she noted that D.O. had a very serious problem in seven out of the nine listed functions. (R. 311). The nine functions included: handling frustration properly, being patient when necessary, being responsible for taking medication, identifying, and asserting appropriate emotional needs, responding appropriately to changes in mood, using appropriate coping skills to meet daily demand of school environment, and knowing when to ask for help. *Id.* In six out of those nine functions, Ms. Roth noted that he had issues on an hourly basis. *Id.* She also indicated that he had a serious problem using good judgment regarding personal safety on a daily basis, a slight problem caring for physical needs on a daily basis, and a slight problem taking care of personal hygiene. *Id.*

The ALJ, however, ignored this evidence in his analysis. He did not provide any explanation for cherry picking the narrative section of the questionnaire where Ms. Roth pointed out that D.O. had no problem in this domain when he took his medication. *See Cole v. Colvin*, 831 F.3d 411, 416 (7th Cir. 2016) (finding that it was improper for the ALJ to cherry pick parts of the medical record); *Gantner o/b/o M.J. v. Berryhill*, No. 16 C 10531, 2017 WL 6757574, at *6 (N.D. Ill. Dec. 18, 2017) ("an ALJ may not cherry pick from the record the evidence supporting a conclusion and disregard evidence to the contrary."). Furthermore, not only did the ALJ not address Ms. Roth's relevant remarks in the marked caring for yourself section of the opinion, he also did not mention them anywhere else in the opinion. Notably, however, the ALJ did consider Ms. Roth's specific function determinations when he analyzed the attending and completing tasks domain and the interacting and relating with others domain. Yet, in the caring for yourself domain, the ALJ did not articulate what weight if any he gave to the portions of Ms. Roth's questionnaire

which might support a finding of marked limitation in this domain. *See Williams v Colvin*, No. 14 C 2172, 2016 WL 880531, at *3 (N.D. Ill. Mar. 1, 2016) (remanding where ALJ's analysis consisted of a few sentences in the caring for yourself domain, and omitted any analysis of contradictory facts).

Second, as part of his analysis in the caring for yourself section, the ALJ listed the regulations that govern this domain, but he failed to use the regulations he listed to guide his analysis. He stated that school-age children should be able to avoid behaviors that are unsafe or otherwise not good for them. *See* (R. 87). He also included language from the regulations that say: engaging in self-injurious behavior such as suicidal thoughts or actions, self-inflicted injury, or refusal to take medication are examples of behavior exhibited by children who could have difficulty caring for themselves. *Id.* Notwithstanding the listed regulations, the ALJ did not mention D.O.'s history of head banging and self-harm in his analysis. Although, the ALJ did reference, in his statement of facts, D.O.'s self-injurious behavior twice: first when he attended the partial hospitalization program at Hartgrove Hospital in 2016, and second when he was hospitalized in March 2017, the record is replete with other evidence of D.O. engaging in self-injurious behavior that the ALJ did not mention. *Id.* at 80-81. For example, D.O. often mentioned that he hit himself when he was angry, and on October 16, 2018 his school arranged a crisis assessment because he was stabbing himself in the stomach with a pencil. *See id*. at 358, 448, 412, 419, 495, 484, 489, 544, 603, 608. Additionally, his school disciplinary records list instances when he exhibited self-injurious behavior including when he hit his head on a wall, cut his wrists with a pencil, and banged his head on a whiteboard. *Id.* at 287, 294, 295, 300.

Though the ALJ is not required to explain his reasoning within the paragraphs explicitly designated for a particular domain, an ALJ must sufficiently articulate his assessment of the evidence and build an accurate and logical bridge between the evidence and his conclusions. *Orlando v. Heckler,* 776 F.2d 209, 213 (7th Cir. 1985) (refusing to require an ALJ to lay out his determinations and supporting reasoning in a "conclusion" section, as opposed to a "discussion" section, and calling any such requirement a "needless formality"). Here, the ALJ failed to connect the dots between the two times he pointed to D.O.'s self-injurious behavior in his statement of acts, and his finding of no limitation in this domain. Despite the ALJ's reference to the regulations that describe self-injurious behavior as an example of a behavior that school-age children with difficulty caring for themselves exhibit, it is unclear if he analyzed D.O.'s history of self-injurious behavior at all, in any paragraph. *See Crawford v Berryhill*, No. 16 C 11450, 2018 WL 453739, at *5 (N.D. Ill. Jan. 17, 2018) (court remanded because, in the caring for yourself domain, "[t]he ALJ did not address evidence throughout the record of impulsive and aggressive behaviors such as hitting siblings, classmates, and teachers and ignoring school safety rules."). And, even if it is assumed that the ALJ did consider the two mentioned instances of self-injurious and suicidal ideation in his analysis, the ALJ did not resolve how the remaining evidence of self-injurious behavior was considered. *See Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 487–88 (7th Cir. 2007) ("We require an explanation of why strong evidence favorable to the plaintiff is overcome by the evidence on which an ALJ relies").

Third, the ALJ stated that, according to Ms. Roth, D.O. had no limitation in this domain when he took his medication, but he provided no explanation of how D.O. inconsistency in taking medication affected his analysis. The ALJ did, referenced D.O.'s inconsistent medication regimen

14

a few times in the record.³ For example, he referenced D.O.'s testimony that he only took his medication *sometimes,* D.O.'s grandmother's testimony that D.O.'s symptoms subside with medication, and Angela O.'s statement that he was doing better on medication. (R. 79, 82). He also noted that D.O. has special education accommodations because he is inconsistent with his medication, that he had difficulty when he was off his medication, and that progress was made when he was on his medication. *Id*. Nonetheless, these factual statements alone do not create a traceable link to the ALJ's finding, and they do not help the Court determine whether the ALJ adequately discussed the issues. It is insufficient for the ALJ to simply conclude that D.O. has no limitation in caring for himself when he takes his medication when the record shows, and the ALJ acknowledges, that there is also evidence of inconsistency in his medication intake. Further, the ALJ ignored D.O.'s continued issues with self-injurious behavior reflected in the record, discussed above, despite being on medication. *See Hopgood*, 578 F.3d at 703 (remanding where an ALJ failed to explain how evidence that medication did not ameliorate the claimant's behavior supported a finding of no disability). Despite any improvement that D.O. exhibits when he is on medication, the ALJ did not explain how D.O. has reached the level of function that a non-impaired child of his age range should have in this domain. *See Edwards ex rel. L.T. v. Colvin*, No. 12 C 7639, 2013 WL 3934228, at *12 (N.D. Ill. July 30, 2013) ("A child can improve with medication and still have profound limitations."). The ALJ's opinion is void of

---

³ There were other instances of inconsistent medication use that were not mentioned by the ALJ. For example, prior to being admitted at Hartgrove Hospital in 2017, D.O. had not taken his medications for two weeks; Ms. Roth noted that D.O. did not take his medication approximately every two weeks or once every ten days, and that during those occasions it was impossible for him to access the curriculum; D.O.'s grandmother testified that his behavioral issues did not go away with medication, although they did subside, and that she is able to corral him a bit better when he is on his medication. (R. 42, 312, 440, 447)

reasoning that closes the gap between D.O.'s unstable and inconsistent medication regimen and the ALJ's determination of no limitation in this domain.

In the ALJ's analysis of the interacting and relating with others domain, where he did find a marked limitation, the ALJ also included the same problematic one-off statement that he included in his analysis of the caring for yourself domain; that, according to his teacher, D.O.'s had no problems in the domain when he took his medication. The ALJ's reference to the same sentence in two domains, where he came to *opposite* conclusions, does nothing to help the Court determine whether the ALJ adequately discussed the issues. In fact, this sentence further muddles the ALJ's reasoning and obscures any conceivable logical bridge between the evidence and his determination.

The Commissioner argues that the ALJ did not need to analyze how D.O.'s inconsistency with his medication was weighed in his decision making because the record does not show that D.O. ever *refused* to take his medication. Doc. [30] at 12. Nevertheless, the regulations generally explain that the caring for yourself domain means recognizing when you are ill, following recommended treatment and taking medication as prescribed. 20 C.F.R. § 416.926a(k). Refusal is not the only consideration when evaluating whether D.O. can properly take his medication regularly and on time. A failure on the part of a child to properly follow a medication regimen can also be a valid consideration. Furthermore, that argument "does not appear in the ALJ's opinion, and thus it cannot be used here." *Larson v. Astrue*, 615, F.3d 744, 749 (7th Cir. 2010); *see also Meuser v. Colvin*, 838 F.3d 905, 911 (7th Cir. 2016) ("[T]he ALJ did not rely on this rationale in his opinion, so the Commissioner cannot now rely on it.").

Lastly, the Court notes that the ALJ did not mention D.O.'s psychiatric evaluations performed by Ada S. McKinley Community Services on April 3, 2017 and on October 16, 2018,

16

where the assessing psychiatrist determined that D.O. had serious and major impairments in social occupational or school functioning and symptoms that could be related to suicidal ideation and suicidal attempts with clear lethal intent. (R. 433, 544). The ALJ should have also discussed and considered this line of evidence, and weighed it in reaching his conclusion.

In sum, the ALJ's conclusion that D.O. does not have a limitation in this domain is not supported by substantial evidence.[4]

## CONCLUSION

The Court is unable to assess the validity of the ALJ's reasoning and findings because he overlooked portions of the record and failed to minimally articulate his reasoning. Thus, the ALJ's decision is not supported by substantial evidence. This is not harmless error as a "marked" limitation in two categories would amount to a finding of functional equivalence, 20 C.F.R. § 416.926a, and the ALJ has already found a marked limitation in one category. On remand, the ALJ shall re-evaluate D.O.'s ability to care for himself in accordance with this opinion. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Commissioner's Motion for Summary Judgment [29] is denied.

**SO ORDERED.**

Dated: November 15, 2021

_____
Sunil R. Harjani
United States Magistrate Judge

---

[4] Because the Court remands on this issue, the Court need not address the other arguments raised by claimant in its motion. However, on remand, the ALJ is urged to better articulate his analysis on the attending and completing tasks domain as it is currently brief and could be more fully developed.